UNITED STATES of America,
Plaintiff-Appellee,

v.

W. Darrell ZANG and Louis Porter,
Defendants-Appellants.

No. 10–26.

Temporary Emergency Court of Appeals.

Argued Jan. 12, 1981.

Decided March 5, 1981.

See also, Em.App., 653 F.2d 493.

B. Hayden Crawford, Crawford, Crowe &
Bainbridge, Tulsa, Okla., with whom Joe D.
Dillsaver, Tulsa, Okla., of the same firm, was
on the brief, for defendant-appellant W.
Darrell Zang.

James C. Lang, Sneed, Lang, Adams,
Hamilton, Downie & Barnett, Tulsa, Okla.,
with whom William J. Wenzel, Tulsa, Okla.,
of the same firm, was on the brief for
defendant-appellant Louis Porter.

Stephen P. Learned, U. S. Dept. of Jus-
tice, Washington, D.C., with whom Richard
M. Fishkin, Washington, D.C., and Hubert

H. Bryant, U. S. Atty. for the Northern District of Oklahoma, Tulsa, Okla., were on the brief for plaintiff-appellee, United States of America.

Before INGRAHAM, ESTES and PECK, Judges.

ESTES, Judge:

On April 2, 1980, Appellants, W. Darrell Zang and Louis Porter (Defendants), were charged by the grand jury in a 16-count indictment in the United States District Court for the Northern District of Oklahoma, appearing on pages 9–23 of Volume I of the Record on Appeal and attached hereto as Appendix A. The indictment alleged against both defendants violations of certain general criminal statutes. Count 1 alleged violation of 18 U.S.C. § 371 (conspiracy). Counts 2 through 7 alleged violations of 18 U.S.C. § 1341 and § 2 (mail fraud and principals). Counts 8 through 15 alleged violations of 18 U.S.C. § 1343 and § 2 (wire fraud and principals). Count 16 alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a), § 1963 and § 2. The indictment also alleged that pursuant to 18 U.S.C. § 1963(c) certain alleged interests of defendants were subject to forfeiture and seizure by the Government.

On the same date that the indictment was returned, April 2, 1980, the Government moved for a restraining order under 18 U.S.C. § 1963 to enjoin defendants from alienating any of their property allegedly subject to forfeiture under the indictment. The district court granted that motion and entered a restraining order covering the property.

On April 30, 1980, defendants' motions to dismiss the indictment, together with supporting briefs, were filed in the district court. [R. 33–66 re Zang, and 67–117 re Porter] In their TECA briefs appellants state:

"Among the major arguments raised [in the district court] and supported was that the Government was attempting to circumvent the provisions of the EPAA by alleging violations of the general criminal statutes, that 15 U.S.C. § 754 specifically superseded or preempted the general criminal statute, and that the Government was selectively attempting to prosecute these defendants." [Zang Br. 3 and Porter Br. 2–3 in TECA]

On July 18, 1980, the district court entered the order appealed from, denying defendants' motions to dismiss the indictment. [R. 303–304] That order is attached hereto as Appendix B.

Appellants' appeal is based on essentially the same grounds as those advanced in their motions to dismiss the indictment. Appellants seek reversal of the July 18 order of the district court, contending that the court in overruling the motions to dismiss abused its discretion, and seek this court's writ of mandamus ordering the trial court to sustain their motions to dismiss the indictment. [Zang Br. 15 and Porter Br. 16 in TECA]

Defendant Porter, chairman of the board and chief executive officer of Great Yellowstone Corporation, owned all or part of the stock of and controlled Great Yellowstone Corporation, Dalco, Inc., Dalco Crude, Inc., and Dalco Petroleum, Inc., which companies, hereinafter referred to as DALCO, were engaged in either crude oil trading or general oil and gas business; the last three companies being subsidiaries of the first. Defendant Zang, director and second largest stockholder of Great Yellowstone Corporation, was part owner of Dalco, Inc., and a fifty-fifty (50–50) partner with defendant Porter in Dalco Investments. [R. 12]

The indictment alleged that defendants devised a fraudulent scheme through the use of their companies and the mail and wire communications, whereby they could resell "old" crude oil at "new" or "exempt" oil prices. They first purchased West Texas crude oil from Cities Service Corporation (Cities Service) at the maximum or ceiling price for "old oil" (lower tier) lower priced crude.[1] Then, they resold the oil to West-

---

1. "Old oil" or lower tier crude is that production of domestic oil at or below a certain base period level of production set for an oil property. 10 C.F.R. § 212.72. The maximum selling

ern Crude Oil, Inc. (Western), as "new" (upper tier) or "exempt" higher priced oil and certified such as new or exempt oil.[2] [R. 14] This sale and miscertification of old oil as new or exempt oil at a price in excess of the ceiling price was a violation of the mandatory petroleum price regulations, in particular 10 C.F.R. § 212.131(b)(1), which body of regulations was promulgated pursuant to the Emergency Petroleum Allocation Act of 1973 (EPAA), as amended.[3] 15 U.S.C. § 751, et seq.

Willful violations of these regulations carry misdemeanor penalties including fines and a maximum of one year in prison. 15 U.S.C. § 754.

However, defendants were not indicted for violations of the EPAA, as amended. On the contrary, they were charged with graver federal felony offenses of conspiracy, mail fraud, wire fraud and racketeering. The alleged agreement to defraud Western by miscertifying old oil as new or exempt and thereby illegally charging the difference (some $7,000,000) between old oil prices (plus a customary gathering and handling charge) and new or exempt oil prices was a criminal conspiracy within 18 U.S.C. § 371. Their use of the U. S. mail and wire services to accomplish their unlawful ends were criminal acts within 18 U.S.C. §§ 1341 and 1343 and 2. And defendants were charged with furthering their fraudulent

scheme on several occasions which puts such activity within 18 U.S.C. §§ 1962(a), 1963 and 2 as racketeering.

The indictment charged that defendants induced Western to enter into contracts to buy Cities Service oil from DALCO at a price no higher than DALCO had paid Cities Service (with the exception of the gathering charge). In submitting invoices under these contracts, defendants would fraudulently certify old oil as new or exempt. [R.14] Western would unknowingly pass on these false certifications to other purchasers, affecting the price paid by subsequent purchasers of the crude oil.[4] To support their illegal activities and deceive DOE auditors, defendants caused fictitious journal entries in the DALCO books and created other false documents and records.[5] [R. 14–16] All of these activities by the defendants culminated into the fraud.

Not only did defendants' conduct as charged defraud Western, it also defrauded the United States. In 1973 Congress enacted the EPAA in an effort to alleviate petroleum shortages by establishing price and allocation controls on crude oil and petroleum products. The pricing regulations promulgated pursuant to the EPAA, as amended, are administered by the Department of Energy (DOE).[6] The DOE through its subpoena powers investigates and audits in an effort to enforce the mandatory pricing sys-

---

price for this crude when sold by Cities Service was approximately $5.25/barrel. [Govt.Br.3]

2. "New oil" is that production from an oil producing property which exceeds its base period level of production. 10 C.F.R. § 212.72. The average selling price for West Texas crude certified as new was approximately $11.25/barrel. [Govt.Br.3]

 "Exempt oil" is other categories of oil, including stripper (10 C.F.R. § 212.54) and foreign (10 C.F.R. § 212.53) oil, which are exempt from price controls. The average price for West Texas stripper crude was approximately $13.50/barrel. [Govt.Br.3]

3. These mandatory temporary petroleum pricing and allocation regulations were upheld as valid and constitutional in *Consumers Union of U. S., Inc. v. Sawhill*, 525 F.2d 1068 (TECA 1975); *Condor Operating Co. v. Sawhill*, 514 F.2d 351 (TECA 1975), *cert. denied*, 421 U.S.

976, 95 S.Ct. 1975, 44 L.Ed.2d 467; and *Cities Service Co. v. F.E.A.*, 529 F.2d 1016 (TECA 1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184.

4. Each "reseller" of crude oil as defined by 10 C.F.R. § 212.31 must give a certification of the oil sold to the purchaser. 10 C.F.R. § 212.-131(b)(1). Since the price of oil is regulated pursuant to its certification, each purchaser may look to its immediate seller for reimbursement if oil is miscertified.

5. Defendants as resellers were required to keep records to show compliance with the maximum lawful selling price. 10 C.F.R. § 210.92(a) and (b).

6. Predecessor to the DOE was the Federal Energy Administration (FEA), and predecessor to the FEA was the Federal Energy Office (FEO).

tem. The alleged creation of false documents and journal entries by DALCO would not only frustrate DOE's efforts to enforce the regulations but would allow defendants to gain some $7,000,000 in overcharges for oil. The cost of miscertified oil passed through to the purchaser raises the price of oil, gasoline and other refined products to the ultimate consumer, thereby defeating Congress' objectives for the EPAA and its pricing system.

## TECA JURISDICTION

■ We are of the opinion that the Temporary Emergency Court of Appeals (TECA) lacks jurisdiction of this appeal.

Section 211(b)(2) of the Economic Stabilization Act of 1970 (ESA) provides that the Temporary Emergency Court of Appeals shall have "exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder." 12 U.S.C. § 1904 note (1977 supp.). Section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), as amended, 15 U.S.C. § 754, incorporates and carries forward this grant of special jurisdiction.

The district court's July 18 order denying defendants' motions to dismiss the indictment is not a "case or controversy arising under the EPAA, as amended." The Title 18 offenses charged in the indictment are not actions giving rise to TECA jurisdiction even if connected with regulatory violations. *United States v. Cooper*, 482 F.2d 1393 (TECA 1973). In *Cooper* the defendant was indicted for violations of regulations promulgated by the Economic Stabilization Act, by raising rents, failing to keep rent records, and by taking retaliatory action against tenants. He was also indicted for making false statements in violation of 18 U.S.C. § 1001, by lying about rent increases. At trial Cooper was acquitted on all counts except the false statement count in violation of Title 18 U.S.C. § 1001 and the count charging him with taking retaliatory action against tenants. He appealed the conviction on these counts to the Ninth

circuit which transferred the case to the TECA. TECA concluded as follows:

"We do not believe that the charge in Count 1, based on 18 U.S.C. § 1001, arises within the appellate jurisdiction of the TECA. We start with the premise that a conviction under 18 U.S.C. § 1001 would be appealable only to a court of appeals, under 28 U.S.C. § 1291, unless the Stabilization Act provides otherwise. We find nothing in Section 211(b)(2), of the Act which so provides. Section 211(b)(2) speaks of 'controversies arising under this title or under regulations or orders issued thereunder.' We do not think that Count 1, being based on 18 U.S.C. § 1001, was a controversy 'arising under' any title of the Stabilization Act or under regulations or orders issued thereunder.

\* \* \* \* \* \*

"The language in the Stabilization Act, 'in cases and controversies arising under this title' would require a loose construction in order to cover the charge in Count 1 of false representations on matters of rent control. Such a loose construction is unacceptable in light of the traditional rule that courts of special jurisdiction should strictly construe their statutory grants of jurisdiction.

"Moreover, there is no indication that Congress intended to include existing offenses, already covered by Title 18, under the umbrella of the Stabilization Act. There was surely no need for such double coverage. The ordinary criminal statutes remain available to the prosecutor, and in fact the prosecutor in this case used such statutes in the indictment against Cooper. (Footnote omitted)

"We therefore hold that the charge in Count 1, based on 18 U.S.C. § 1001, was not a case or controversy arising under the Stabilization Act." 482 F.2d at 1397–1398.

In *Bray v. United States*, 423 U.S. 73, 96 S.Ct. 307, 46 L.Ed.2d 215 (1975), the Supreme Court stated with reference to Section 211(b)(2) of the ESA, as amended:

"This judicial-review provision was designed to provide speedy resolution of

cases brought under the Act and 'to funnel into one court all the appeals arising out of the District Courts and thus gain in consistency of decision.' S.Rep.No. 92–507, p. 10 (1971), U.S.Code Cong. & Admin.News 1971, pp. 2283, 2292.

\*　　\*　　\*　　\*　　\*　　\*

"Nothing in the Act or in its legislative history indicates that Congress intended 'to include existing offenses, already covered under Title 18, under the umbrella of the Stabilization Act.' *United States v. Cooper*, 482 F.2d 1393, 1398 (TECA 1973). Review in the TECA of criminal contempt convictions relating to compliance investigations or enforcement efforts is not necessary to assure uniform interpretation of the substantive provisions of the stabilization scheme. Indeed, a requirement of such review would only serve to undermine the prompt resolution of Stabilization Act questions by burdening the TECA with additional appeals." (Footnote omitted) 96 S.Ct. 307, 309.

It is not enough that the indictment included an explanation of the EPAA regulations proscribing miscertification and that such regulations provided a convenient format for defendants' scheme of fraud and criminal enterprise. The issue before this court is whether its jurisdiction encompasses the felony offenses charged in the indictment. Certainly, the EPAA, as amended, does not "provide" for or mention any of these grave felony offenses, and this court has no jurisdiction of this appeal.

This court lacks jurisdiction of this appeal for another reason. Defendants asserted TECA appellate jurisdiction of the district court's order denying their motions to dismiss the indictment under 28 U.S.C. § 1292. Appellants contend that:

"By placing the validity and continuing existence of the Indictment at issue in Defendants' motions to dismiss, the necessary and direct result of any order entered by the court would have been to dissolve or continue the injunction entered against Defendants.

"Under § 1292 of Title 28, United States Code, this Court, as a court of appeals, has jurisdiction over interlocutory orders of the district courts of the United States continuing or refusing to dissolve an injunction. The order of July 18, 1980 is such an order...." [Porter Br. 14]

However, this court has no jurisdiction over an appeal taken under § 1292(a) without proper certification by the district judge "in accordance with the provisions of section § 1292(b) of Title 28 United States Code." *Exxon Corp. v. Federal Energy Admin.*, 516 F.2d 1397, fn. 3, 1403, 1404 (TECA 1975).

Appellants take the position that TECA has jurisdiction of this appeal because "the real basis of the controversy is the EPAA (15 U.S.C. § 751, et seq.)" [Zang Br. 2] and "that U.S.C. § 754 specifically superseded or preempted the general criminal statute" [Zang Br. 3], thereby making this a case arising under the EPAA, as amended. [Porter Br. 2, 14, 15]

Although we are of the opinion that TECA does not have jurisdiction of this appeal because defendants were not indicted for violations of the EPAA, in the interest of an expeditious disposition of this litigation [ESA § 211(b)(1)/EPAA § 5(a)], we should note that it is our opinion that the order of the careful trial judge, attached as Appendix B, is correct.

### PREEMPTION OR IMPLIED REPEAL

A comparison of the charged felony statutes with the EPAA regulations regarding miscertification reveals that the felony statutes require proof of additional elements not required in the misdemeanor regulation prohibiting miscertification. Conspiracy includes the element of "agreement" which is not an element of the crime of miscertification. The racketeering (RICO) count has the element of duplication; one must be engaged in a criminal "enterprise". The crimes of mail and wire fraud require the additional proof of a "scheme". While defendants may have violated EPAA regulations, they are charged with far more serious crimes, the breadth of which encompasses any such prohibited con-

duct under those regulations. In the Supreme Court's earliest dealings with the issue of implied repeal, Justice Story wrote:

"... [I]t is not sufficient to establish that subsequent laws cover some or even all of the cases provided for by it; for they may be merely affirmative, or cumulative, or auxiliary. But there must be a positive repugnancy between the provisions of the new law and those of the old...." *Wood v. United States*, 41 U.S. (16 Pet.) 342, 362–363, 10 L.Ed. 987 (1842).

We are of the opinion that:

"... [T]here is no repugnancy between the provisions; and to construe the latter as repealing the former would be to construe provisions to aid in the detection of fraud, in such a manner as to promote fraud, by cutting down provisions of a far more general and important character, and essential to the security of the [nation]." *Wood, supra*, p. 366.

The authorities cited in the district court's order appealed from sustain the conclusion that the EPAA as amended in 15 U.S.C. § 754 did not supersede nor impliedly repeal the application of the provisions of the criminal statutes with which defendants were charged in the indictment.

In *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), the Supreme Court held that prosecution under either of two overlapping provisions of the Omnibus Crime Control Act prohibiting convicted felons from receiving firearms, one carrying a sentence of five and the other of two years imprisonment, was not selective prosecution. Further, that the latter enacted statute of Title VII did not impliedly repeal the provision in Title IV simply because a defendant's conduct might violate both titles. "Rather, the legislative intent to repeal must be manifest in the 'positive repugnancy between the provi-

sions.' *United States v. Borden Co.*, 308 U.S. 188, 199, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939)." *United States v. Batchelder, supra*, 2203. See also *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936), which states:

"The cardinal rule is that repeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both if possible.... [T]he intention of the legislature to repeal must be clear and manifest...."

We can see nothing manifest in the legislative history of the penalty provisions of 15 U.S.C. § 754 which indicates Congress' intent to impliedly repeal the charged felony statutes with the enactment of the EPAA amendments in the Energy Policy and Conservation Act (EPCA) of December 22, 1975, P.L. 94–163, 89 Stat. 871, 941, et seq.[7] With regard to 15 U.S.C. § 754(a)(4), the Senate Conference Committee stated:

"With the exception of this latter proviso [limiting the authority to seek a term of imprisonment for corporate officers in the absence of knowledge of notice of noncompliance], nothing in this section is intended to change existing case law relating to the individual responsibility of corporate directors, officers or agents for violations of those corporations." Senate Conference Report, at 200, 94th Cong. 1st Sess., reprinted in [1975] U.S.Code Cong. & Ad.News, 2042.

Congress was not changing the law with respect to the Title 18 felony offenses charged but the case law of agency regarding a corporate officer's or agent's derivative liability for corporate EPAA violations only.

Congress was then considering penalties for EPAA violations, *not* for violations of Title 18 felony statutes of a "far more

---

7. Appellants' argument that an individual director, officer, or agent cannot be imprisoned for a misdemeanor term "unless he also has knowledge or reasonably should have known of notice of noncompliance received by the corporation from the President" is inapplicable since § 452 of the EPCA (15 U.S.C. § 754) expressly related to "Penalties Under the Allocation Act," stating: "Sec. 452. Section 5 of the Emergency Petroleum Allocation Act of 1973 is amended.... [to provide in addition to civil fines a misdemeanor term of imprisonment]." 89 Stat. 948–949.

general and important character, and essential to the security of the [nation]." *Wood, supra,* 366. Since Congress amended the penalty provisions of the EPAA subsequent to the *Cooper* decision discussed above, Congress was undoubtedly aware of the fact that the TECA does not have jurisdiction of the Title 18 offenses charged. We cannot imply that Congress intended—without mention of Title 18 offenses—to supersede or repeal the jurisdiction of United States Courts of Appeals as to Title 18 offenses and by amendment of the penalty provisions of the EPAA to confer jurisdiction on TECA to review Title 18 cases involving use of the mails and wire services to further conspiracies, schemes and enterprises to defraud.

In a case similar to the case at bar the Supreme Court upheld a felony conviction under the predecessor statute of the present false statements statute, 18 U.S.C. § 1001, then § 35, 18 U.S.C.A. § 80. Although the defendants might have been prosecuted for violation of the "Hot Oil" Act 49 Stat. at L. 30, 31, chap. 18, which provided misdemeanor punishment for transportation in interstate commerce from any state of "contraband oil", the court held that the later act, with its provision as to false papers, was a complement to the general felony statute. Further, the Court held that Congress did not intend the "Hot Oil" Act as a substitute for any part of the false statements felony statute. *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941).

Appellants' reliance on the enhancement case, *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), is misplaced. *Busic* deals with increased punishment for commission of felony offenses committed with firearms or deadly weapons, not the reduction of punishment for the felony offenses charged to misdemeanor punishment for violation of the EPAA.

Appellants have failed to show that Congress intended, in enacting the EPAA amendments of 1975, including 15 U.S.C. § 754 which provides maximum misdemeanor criminal penalties for violations of the EPAA and regulations promulgated thereunder, to take away from the American people the protections afforded by the federal felony mail fraud, wire fraud, racketeering (RICO) and conspiracy statutes simply because defendants' conduct may also violate the EPAA providing misdemeanor punishment with conditional one-year maximum term of imprisonment.

It should be noted that since the filing of this appeal both defendants have been tried and convicted of the sixteen offenses charged in the indictment here in question and have simultaneously appealed their convictions to the Tenth Circuit Court of Appeals, Tenth Circuit No. 80–2227, and to this court under TECA Nos. 10–29 and 10–30.

## CONCLUSION

We conclude that this court lacks jurisdiction of this appeal and, in any event, the order of the district court appealed from, Appendix B, was correct, and appellants' request for issuance of this court's writ of mandamus ordering the district court to sustain their motions to dismiss the indictment should be denied and that this appeal should be dismissed.

It is so ORDERED.

## APPENDIX A

IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OKLAHOMA

CRIMINAL NO.

. 80–CR–33–C

(T. 18 U.S.C. §§ 371, 1341, 1343,
1962(a), 1963 & 2)

UNITED STATES OF AMERICA

v.

W. DARRELL ZANG

AND LOUIS PORTER

INDICTMENT

THE GRAND JURY CHARGES

That at all times material herein:

## COUNT 1

### A. INTRODUCTION

1. There was in existence the Emergency Petroleum Allocation Act (EPAA) of 1973, Title 15, United States Code, Section 751, *et seq.*, and the regulations promulgated thereunder, which provided for price controls and mandatory allocation of all crude oil produced in or imported into the United States.

2. In order to require a producer, seller, or reseller of domestic crude oil to maintain its historic profit margin with respect to designated portions of said crude oil and not to reap windfall profits in a rising price market, the Federal Energy Administration (FEA) and its successor agency, the United States Department of Energy (DOE), agencies of the United States, administered within the Mandatory Petroleum Price Regulations a multi-tier pricing system under which the price that may be charged for domestic crude oil was dependent on the regulatory category of the crude oil.

3. The regulatory categories "old" (also referred to as "lower tier"), "new" (also referred to as "upper tier"), and "stripper" were strictly price control categories and were not based upon any physical or chemical characteristics of the crude oil but were based upon the history or the level of production from an oil producing property. 10 C.F.R. §§ 212.71–212.74.

4. "Old" oil (lower tier) had the lower maximum lawful selling price adjusted to the May 15, 1973 selling price for crude oil of like grade and quality coming from the same oil producing property at or below a designated level of production in 1972. "New" oil (upper tier) which referred to crude oil discovered since 1972 or oil obtained from producing properties in excess of the properties' 1972 level of production, had a higher maximum lawful selling price. "Stripper" oil, defined as that crude oil produced from a property whose average daily production per well did not exceed ten barrels per day during the qualifying period, was exempt from price controls and could be sold at the world market price. 10 C.F.R. § 212.54.

5. The Mandatory Petroleum Price Regulations provided for a certification requirement with regard to the purchase and sale of domestic crude oil.

6. In the beginning of the relevant time period herein, said certification program, as set forth within the Mandatory Petroleum Price Regulations, provided in pertinent part at 41 F.R. 37309 (September 3, 1976), 10 C.F.R. § 212.131(b)(1), that

> Each seller of domestic crude oil, other than a producer of domestic crude oil . . . shall, with respect to each sale of domestic crude oil . . . certify in writing to the purchaser the respective volumes of and respective per barrel prices for the old crude oil, new crude oil, stripper well crude oil, and other domestic crude oils the first sale of which is exempt from the provisions of this part included in the volume of domestic crude oil so sold. The certification shall also contain a statement that the price charged for the domestic crude oil is no greater than the maximum price permitted pursuant to this part.

Although amended in immaterial respects from time to time during the relevant time period at 42 F.R. 41565 (August 17, 1977); 42 F.R. 62897 (December 14, 1977); 42 F.R. 64956 (December 29, 1977); 43 F.R. 26540 (June 20, 1978); and 43 F.R. 33679 (August 1, 1978); this provision of the certification program remained in effect throughout the relevant time period.

7. There was also in existence a regulation requiring firms subject to the Mandatory Petroleum Price Regulations to maintain records sufficient to demonstrate that prices charged were in compliance with the Mandatory Petroleum Price Regulations and to make said records available upon request to the FEA or its successor agency, the DOE. 10 C.F.R. § 210.92(a) and (b).

8. The Mandatory Petroleum Allocation Regulations, promulgated by the FEA and its successor agency, the DOE, under authority of the EPAA provided for the allocation of price-controlled domestic crude oil among domestic refiners under what is re-

ferred to as the "Entitlements Program." 10 C.F.R. § 211.67. The Entitlements Program was maintained by the FEA and the DOE to adjust cost inequities to refiners which result from the multi-tier pricing system for domestic crude oil. Domestic refiners, under the Program, who had purchased and processed lower priced "old" oil (lower tier crude oil) in excess of the national average, determined monthly by the FEA and the DOE from reports filed by the refiners, must compensate those refiners who had purchased and processed more expensive "new" oil (upper tier crude oil) or price exempt oil, thereby tending to equalize the acquisition costs for said domestic refiners.

9. CITIES SERVICE COMPANY (hereinafter "Cities Service"), a recent successor by merger of CITIES SERVICE OIL COMPANY, was a corporation organized under the laws of Delaware with its principal office in Tulsa, Oklahoma, and was engaged in the production, sale, and transportation of crude oil.

10. WESTERN CRUDE OIL, INC. (hereinafter "Western") was a corporation organized under the laws of Delaware with its principal office in Denver, Colorado, and was engaged in the business of buying, selling, and transporting crude oil.

11. GREAT YELLOWSTONE CORPORATION, presently existing and operating under the name of DALCO PETROLEUM CORPORATION, was a corporation organized under the laws of the State of Nevada, having its principal place of business in Tulsa, Oklahoma, and was engaged in the general oil and gas business and in the manufacture of insulation products and steel fabrication.

12. DALCO, INC., was a corporation organized under the laws of the State of Oklahoma, with its principal office in Tulsa, Oklahoma, was engaged in crude oil trading, and on May 31, 1978, became a subsidiary of GREAT YELLOWSTONE CORPORATION.

13. DALCO CRUDE, INC., was a corporation organized under the laws of the State of Oklahoma, with its principal office in Tulsa, Oklahoma, was engaged in crude oil trading, and was a subsidiary of DALCO PETROLEUM, INC.

14. DALCO PETROLEUM, INC., was a corporation organized under the laws of the State of Oklahoma, with its principal office in Tulsa, Oklahoma, was engaged in the general oil and gas business, and on May 31, 1978, became a subsidiary of GREAT YELLOWSTONE CORPORATION.

15. LOUIS PORTER, chairman of the board and chief executive officer of GREAT YELLOWSTONE CORPORATION owned all or part of the stock of, and controlled, GREAT YELLOWSTONE CORPORATION, DALCO, INC., DALCO CRUDE, INC., and DALCO PETROLEUM, INC.

16. W. DARRELL ZANG, a director of and second largest stockholder of GREAT YELLOWSTONE CORPORATION, was a part owner of DALCO, INC.

17. DALCO INVESTMENTS was a partnership, operating under the laws of Oklahoma, and at all times material herein was owned fifty per cent (50%) each by LOUIS PORTER and W. DARRELL ZANG, and constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), which was engaged in activities which affect interstate commerce.

**B. THE CONSPIRACY AND ITS OBJECTS**

18. Beginning in approximately December, 1976 and continuing up until approximately September, 1978, within the Northern District of Oklahoma and elsewhere, defendants.

W. DARRELL ZANG and LOUIS PORTER

knowingly, willfully, and unlawfully combined, conspired and agreed with each other to commit certain offenses against the United States, to-wit:

(a) to use the mails, and cause the use of the mails in furtherance of a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations

and promises from Western and to defraud indirectly others unknown who were subsequent purchasers of crude oil obtained from Western or from each other, in violation of 18 U.S.C. § 1341;

(b) to transmit, and cause to be transmitted, in interstate commerce by means of wire communication, certain signs, writings and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises from Western and to defraud indirectly others unknown who were subsequent purchasers of crude oil obtained from Western or from each other, in violation of 18 U.S.C. § 1343; and

(c) to defraud the United States of America, and in particular, the Federal Energy Administration and its successor agency, the Department of Energy, of their right to have the Mandatory Petroleum Price Regulations promulgated by those agencies administered honestly, fairly, and free from corruption, fraud, deceit, deception, concealment, and unlawful means.

## C. MEANS OF THE CONSPIRACY AND OF THE SCHEME AND ARTIFICE TO DEFRAUD BOTH WESTERN AND THE UNITED STATES

19. Among the manner and means employed by the defendants W. DARRELL ZANG and LOUIS PORTER to effectuate the objects of the aforesaid conspiracy and to further the scheme and artifice to defraud were the following:

(a) The defendants would cause DALCO CRUDE, INC., and later DALCO, INC. (hereinafter referred to interchangeably as "DALCO"), owned by and/or controlled by defendants, to enter into a series of contracts with Cities Service, whereby Cities Service would sell quantities of West Texas and New Mexico crude oil to DALCO which crude oil, at the time of sale, was in pipelines or in storage terminals attached to pipelines in the West Texas area.

(b) The defendants would cause DALCO to enter into a corresponding series of contracts with Western whereby DALCO would sell to Western the same crude oil in the West Texas pipelines or storage terminals that DALCO had purchased from Cities Service. With the exception of certain gathering and handling charges, the contracts with Western provided that DALCO would charge Western for the crude oil delivered no more than what DALCO paid Cities Service for said crude oil.

(c) In submitting invoices to Western under these contracts, defendants would falsely and fraudulently certify that certain portions of the crude oil sold was new oil (upper tier) or stripper oil when, in truth and in fact, as defendants well knew, said portions of crude oil was old oil (lower tier) and had been certified to DALCO as such by Cities Service, thereby causing Western to pay a higher overall price for the crude oil purchased from DALCO than agreed to under the terms of the contract, to-wit: in excess of seven million dollars ($7,000,000) during the relevant time period.

(d) In concealing from Western the fact that Western was buying fraudulently certified crude oil, defendants would cause Western to unknowingly and unwittingly pass on the fraudulent certifications to subsequent purchasers, affecting the price paid by subsequent purchasers of the crude oil, and thereby causing Western and each subsequent seller of the crude oil should the fraudulent certifications be discovered, to become potentially liable to its immediate purchaser for reimbursement.

(e) In order to give the false impression to anyone, including auditors or FEA/DOE examiners, that DALCO was attempting or had attempted to balance DALCO's discrepancy in crude oil certifications with foreign crude oil purchases, defendants would create fictitious entries and writings in the books and records of DALCO all in the following manner:

(i) the defendants knowingly caused fictitious journal entries in the books of

DALCO, INC., indicating that a $275,000 commission was owed to a Houston, Texas company for that company's efforts in securing for DALCO a source of foreign crude oil as well as a source of smaller amounts of domestic crude oil;

(ii) in support of the fictitious journal entries, defendants knowingly created a fictitious invoice from the Houston, Texas company which invoice billed DALCO for the $275,000 commission; and

(iii) in further support of the fictitious journal entries, defendants knowingly created a sham letter which letter was addressed to a foreign crude oil trader which letter referred to the fictitious $275,000 commission and to DALCO's attempts to buy foreign crude oil.

(f) By creating and then concealing fraudulent certifications on domestic crude oil and placing them into the downstream sale and delivery of such crude oil, defendants would by deceit, fraud, and trickery frustrate and hamper the efforts of the FEA and later the DOE to monitor, control, determine, and regulate the maximum lawful selling price of the crude oil in question for DALCO, Western, and any other subsequent purchasers of the crude oil.

(g) The defendants would use and cause to be used the United States mails for the purpose of executing this scheme and artifice to defraud Western and others unknown.

(h) The defendants would transmit and cause to be transmitted certain writings and signals by means of wire communications in interstate commerce for the purpose of executing this scheme and artifice to defraud Western and others unknown.

## D. OVERT ACTS

20. In furtherance of the aforesaid conspiracy and in order to effect the objects thereof, defendants W. DARRELL ZANG and LOUIS PORTER did, in the Northern District of Oklahoma and elsewhere, commit among others the following overt acts:

(a) On or about December 7, 1976, W. DARRELL ZANG signed a contract with Western whereby Western agreed to buy from DALCO approximately 10,000 barrels per day of West Texas sour crude oil for the month of December, 1976.

(b) On or about May 18, 1977, W. DARRELL ZANG signed a contract with Western whereby Western agreed to buy from DALCO approximately 19,000 barrels per day of West Texas sour crude oil for the months of June and July, 1977.

(c) On or about August 14, 1977, W. DARRELL ZANG signed a contract with Western whereby Western agreed to buy from DALCO approximately 15,000 barrels a day in September, 1977, 10,000 barrels a day in October, 1977, 15,000 barrels a day in November, 1977, and 20,000 barrels a day in December, 1977 of West Texas sour crude oil.

(d) On or about August 12, 1977, W. DARRELL ZANG signed a contract with Cities Service whereby DALCO agreed to buy 6,500 barrels a day of West Texas intermediate crude oil for the month of August, 1977.

(e) On or about January 21, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 1-7736 in the amount of $3,611,500.00 to be sent to Western for crude oil sold in December, 1976.

(f) On or about July 29, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 7-1577 in the amount of $208,811.03 to be sent to Western for crude oil sold in June, 1977.

(g) On or about July 14, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 5-1577B in the amount of $4,715,491.83 to be sent to Western for crude oil sold in June, 1977.

(h) On or about August 11, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 8-1477 in the amount of $897,833.78 to be sent to Western for crude oil sold in July, 1977.

(i) On or about August 11, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 8-1377 in the amount of

$5,648,576.88 to be sent to Western for crude oil sold in July, 1977.

(j) On or about September 13, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 9–1477 in the amount of $2,734,233.38 to be sent to Western for crude oil sold in August, 1977.

(k) On or about September 13, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 9–1577 in the amount of $1,911,018.07 to be sent to Western for crude oil sold in August, 1977.

(*l*) On or about October 14, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 10–1977 in the amount of $4,019,219.21 to be sent to Western for crude oil sold in September, 1977.

(m) On or about October 14, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 10–1777 in the amount of $1,054,098.66 to be sent to Western for crude oil sold in September, 1977.

(n) On or about October 14, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 10–1877 in the amount of $1,168,623.97 to be sent to Western for crude oil sold in September, 1977.

(*o*) On or about November 21, 1977, W. DARRELL ZANG caused a TELEX message amounting to an invoice from DALCO CRUDE, INC. in the amount of $8,851,589.41 to be sent to Western for crude oil sold in October, 1977.

(p) On or about December 12, 1977, W. DARRELL ZANG caused DALCO CRUDE, INC. Invoice No. 12–0177 in the amount of $7,266,188.47 to be sent to Western for crude oil sold in November, 1977.

(q) On or about January 12, 1978, W. DARRELL ZANG caused DALCO INC. Invoice No. C–0104 in the amount of $9,042,948.00 to be sent to Western for crude oil sold in December, 1977.

(r) On or about February 13, 1978, W. DARRELL ZANG caused DALCO, INC. Invoice No. C–0108 in the amount of $5,998,004.00 to be sent to Western for crude oil sold in January, 1978.

(s) On or about March 12, 1978, W. DARRELL ZANG caused DALCO, INC. Invoice No. C–0112 in the amount of $1,358,364.00 to be sent to Western for crude oil sold in February, 1978.

(t) On or about April 18, 1978, W. DARRELL ZANG caused DALCO, INC. Invoice No. C–0122 in the amount of $1,499,269.69 to be sent to Western for crude oil delivered in March, 1978.

(u) On or about May 12, 1978, W. DARRELL ZANG caused a TELEX message to be sent to Western indicating that DALCO, INC. had sent invoices to Western in the total amount of $2,607,653.15 for crude oil sold in April, 1978.

(v) On or about June 12, 1978, W. DARRELL ZANG caused DALCO, INC. Invoice No. C–0134 in the amount of $2,999,340.97 to be sent to Western for crude oil sold in May, 1978.

(w) On or about July 7, 1978, W. DARRELL ZANG caused DALCO, INC. Invoice No. C–0142 in the amount of $2,918,193.32 to be sent to Western for crude oil sold in June, 1978.

(x) On or about August 11, 1978, W. DARRELL ZANG caused DALCO, INC. Invoice No. C–0151 in the amount of $3,096,512.56 to be sent to Western for crude oil sold in July, 1978.

(y) On or about September 8, 1978, LOUIS PORTER caused Sharon Hamm to type a letter addressed to Falcon Petroleum Ltd., in Hamilton, Bermuda.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 THROUGH 7

1. Paragraphs 1 through 17 and 19 of Count 1 are hereby realleged and incorporated as though set forth in full herein, as constituting and describing defendants' scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations.

2. On or about the dates set forth below, within the Northern District of Oklahoma, defendants.

W. DARRELL ZANG and LOUIS POR-
TER

for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, knowingly did cause to be placed in an authorized depository for mail matter, to be sent and delivered by the United States Postal Service to the addresses listed below, according to the directions thereon, the following items:

| Counts | Date | Addressee | Items Mailed |
|---|---|---|---|
| 2 | 8-11-77 | Western Crude Oil P.O. Box 5568 Denver, Co. 80217 | Dalco Crude, Inc., Invoice No. 8-1377 in the amount of $5,648,576.88 for crude oil delivered in July, 1977 |
| 3 | 9-13-77 | Western Crude Oil P.O. Box 5568 Denver, Co. 80217 | Dalco Crude, Inc., Invoice No. 9-1477 in the amount of $2,734,233.38 for crude oil delivered in August, 1977 |
| 4 | 10-14-77 | Western Crude Oil P.O. Box 5568 Denver, Co. 80217 | Dalco Crude, Inc., Invoice No. 10-1977 in the amount of $4,019,219.21 for crude oil delivered in September, 1977 |
| 5 | 12-12-77 | Western Crude Oil P.O. Box 5568 Denver, Co. 80217 | Dalco Crude, Inc., Invoice No. 12-0177 in the amount of $7,266,188.47 for crude oil delivered in November, 1977 |
| 6 | 1-12-78 | Western Crude Oil P.O. Box 5568 Denver, Co. 80217 | Dalco Inc., Invoice No. C-0104 in the amount of $9,042,948.00 for crude oil delivered in December, 1977 |
| 7 | 2-13-78 | Western Crude Oil 'P.O. Box 5568 Denver, Co. 80217 | Dalco Inc., Invoice No. C-0108 in the amount of $5,998,004.00 for crude oil delivered in January, 1978 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

### COUNTS 8 THROUGH 15

1. Paragraphs 1 through 17 and 19 of Count 1 are hereby realleged and incorporated as though set forth in full herein, as constituting and describing defendants' scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations.

2. On or about the dates set forth below in the Northern District of Oklahoma, the defendants.

W. DARRELL ZANG and LOUIS POR-
TER

for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, did transmit and cause to be transmitted certain signs, signals, and sounds in interstate commerce by means of wire communications in that they caused wire transfers of funds from the Continental National Bank in Chicago, Illinois, to the Fourth National Bank in Tulsa, Oklahoma, for deposit in accounts assigned to DALCO CRUDE, INC., DALCO, INC., and/or The Bank of Montreal, as set forth below:

| Count | Approximate Date Of Transfer | Amount Of Deposit |
|---|---|---|
| 8 | 7-22-77 | $4,915,244.36 |
| 9 | 11-21-77 | $8,851,589.41 |
| 10 | 3-23-78 | $1,350,664.00 |
| 11 | 4-28-78 | $1,494,102.60 |
| 12 | 5-22-78 | $2,607,653.15 |
| 13 | 6-22-78 | $2,999,840.97 |
| 14 | 7-17-78 | $2,918,193.32 |
| 15 | 8-21-78 | $3,096,512.56 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

### COUNT 16

1. Paragraphs 1 through 17 and 19 of Count 1 are hereby realleged and incorporated as though set forth in full herein.

2. From approximately June, 1977, to December, 1977, in the Northern District of Oklahoma, the defendants.

W. DARRELL ZANG and LOUIS POR-
TER,

having received monies derived directly 'or indirectly from a pattern of racketeering, did willfully and knowingly use and invest, directly or indirectly, a part of such income and the proceeds of such income in acquisition of an interest in and the establishment and operation of DALCO INVESTMENTS, an enterprise which was engaged in interstate commerce and in activities which affected interstate commerce in violation of Title 18, United States Code, Section 1962(a).

3. As defined by Title 18, United States Code, Sections 1961(1)(B) and 1961(5), the pattern of racketeering activity consisted of and included each and all of the Federal crimes of mail fraud and wire fraud alleged in Counts 2 through 5 and 8 and 9 of this Indictment, the allegations of which are hereby incorporated by reference as if fully set forth herein.

4. Among the methods used by defendants to carry out the acquisition, establishment, and operation of the enterprise was

 to transfer to DALCO INVESTMENTS out of the gross profit obtained from the Cities Service to Western transactions approximately $1,067,576.00.

5. Through the aforesaid pattern of racketeering activity and the aforesaid investment and use of income received from the pattern of racketeering, defendant ZANG did acquire, establish and maintain his fifty per cent (50%) interest in the enterprise, including his fifty per cent (50%) interest in the office building at 2431 East 51 Street, Tulsa, Oklahoma, which building is owned exclusively as an asset of DALCO INVESTMENTS, thereby making his fifty per cent (50%) interest in DALCO INVESTMENTS, including his fifty per cent (50%) interest in the aforedescribed office building, subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1).

6. Through the aforesaid pattern of racketeering activity and the aforesaid investment and use of income received from the pattern of racketeering, defendant PORTER did acquire, establish and maintain his fifty per cent (50%) interest in the enterprise, including his fifty per cent (50%) interest in the office building at 2431 East 51 Street, Tulsa, Oklahoma, which building is owned exclusively as an asset of DALCO INVESTMENTS, thereby making his fifty per cent (50%) interest in DALCO INVESTMENTS, including his fifty per cent (50%) interest in the aforedescribed office building, subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1).

All in violation of Title 18, United States Code, Section 1962(a), 1963 and 2.

### A TRUE BILL
*Foreman of the Grand Jury*

HUBERT H. BRYANT
*United States Attorney*

STEPHEN P. LEARNED
*United States Department of Justice*

RICHARD M. FISHKIN
*United States Department of Justice*

## APPENDIX B

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

No. 80–CR–33–E

UNITED STATES OF AMERICA, PLAINTIFF,

v.

W. DARRELL ZANG AND LOUIS PORTER, DEFENDANTS.

### ORDER

The Court has before it for consideration the Defendant's Motion to Dismiss. Defendants, in their separate motions, attack the Indictment on various grounds, specifically arguing that the sanctions imposed by the Emergency Petroleum Allocation Act preempt or impliedly repeal the general criminal statutes charged in the Indictment; that the Defendants are the victims of selective prosecution; that the provisions of RICO (18 U.S.C. §§ 1961, et seq.) are inapplicable to the Defendants; and that the Indictment is deficient in its allegations.

Defendants' motions have been exhaustively briefed, and ably argued by counsel. The Court, upon consideration of the arguments, and study of the authorities, finds and concludes that Defendants' motions should be overruled and denied in their entirety.

Defendants stand charged with devising a scheme to defraud; the alleged miscertification of oil is an element of the scheme alleged. That such alleged miscertification also happens to be an offense in its own right has no affect upon the government's election to proceed under the general criminal statutes. Different elements are involved, and the charges under the wire and mail fraud statutes are proper. *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *United States v. Gilliland*, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *United States v. Brien*, 617 F.2d 299 (1st Cir. 1980); *United States*

v. *Radetsky*, 535 F.2d 556 (10th Cir. 1976); *United States v. Bettenhausen*, 499 F.2d 1223 (10th Cir. 1974). Neither can the Court agree with Defendants' contention that the E.P.A.A.'s penalty provisions have impliedly repealed the more general provisions found in Title 18. The Court can find no "positive repugnancy" between them, sufficient to support the conclusion that enactment of the E.P.A.A. worked an implicit repeal of the applicable fraud statutes. *United States v. Batchelder, supra.*

The Court finds the Indictment to be sufficient under Rule 7(c), F.R.Crim.P.

Defendants' contentions dealing with selective prosecution and the application of RICO are without merit.

IT IS THEREFORE ORDERED that Defendants' Motions to dismiss be, and the same hereby are, overruled and denied.

It is so ORDERED this 18th day of July, 1980.

JAMES O. ELLISON
*United States District Judge*