### TEXAS AMERICAN OIL CORPORATION, Plaintiff–Appellant,

### v.

### UNITED STATES DEPARTMENT OF ENERGY, Defendant–Appellee.

### No. 93–1152.

United States Court of Appeals, Federal Circuit.

May 10, 1994.

J. Maxwell Tucker, Winstead, Sechrest & Minick, P.C., of Dallas, TX, argued for plaintiff-appellant.

Marc E. Kasischke, Office of Gen. Counsel, Department of Energy, of Washington, DC, argued for defendant-appellee. Stephen C. Skubel and Gilbert T. Renaut, Office of Gen. Counsel, Dept. of Energy, of Washington, DC, were on the brief for defendant-appellee.

Before ARCHER, Chief Judge,*
NEWMAN and MICHEL, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Texas American Oil Corporation appeals the decision of the United States District Court for the Northern District of Texas,[1] reversing the Bankruptcy Court's classification of the Department of Energy's claim as a creditor under the Bankruptcy Code.[2] Texas American appealed the district court's decision to the Fifth Circuit Court of Appeals, relying on subsequent changes in statute and precedent. On motion of the United States Department of Energy (DOE), opposed by Texas American, the Fifth Circuit held that the issue was within the exclusive jurisdiction of the Temporary Emergency Court of Appeals (TECA), and transferred the appeal.[3]

Effective April 29, 1993 the TECA was dissolved, and all continuing and future actions subject to that court's jurisdiction were transferred to the Court of Appeals for the Federal Circuit. Texas American also appeals the transfer of this appeal to the TECA and now to this court. We consider first the question of our jurisdiction.

## I

### JURISDICTION

When the Fifth Circuit transferred the appeal to the TECA, in accordance with *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), that jurisdictional ruling became the law of the case, subject only to the TECA's finding the transfer "plausible". The Supreme Court in *Christianson* had resolved a difference of opinion between the Courts of Appeals of the Seventh Circuit and the Federal Circuit, wherein each believed that the other had exclusive jurisdiction of the subject matter, and each had transferred the case accordingly. The Court held that appellate courts should accept plausible transfer decisions made by sister tribunals, and that courts of appeals should adhere

> strictly to principles of law of the case. Situations might arise, of course, in which the transferee court considers the transfer "clearly erroneous." But as "[t]he doctrine of the law of the case is ... a heavy deterrent to vacillation on arguable issues," such reversals should necessarily be exceptional; courts will rarely transfer cases over which they have clear jurisdiction, and close questions, by definition, never have clearly correct answers. Under law-of-the-case principles, if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end.

486 U.S. at 819, 108 S.Ct. at 2179 (citations omitted) (alterations in original).

---

* Judge Archer assumed the position of Chief Judge on March 18, 1994.

1. *Texas American Oil Corp. v. U.S. Dept. of Energy,* No. 3:92–CV–1146–G (N.D.Tex. Sept. 14, 1992).

2. *In re Texas American Oil Corp.,* No. 387–33522–SAF–11 (Bankr.N.D.Tex. Mar. 5, 1992).

3. *Texas American Oil Corp. v. U.S. Dept. of Energy,* No. 92–1785 (5th Cir. Nov. 12, 1992) (Order).

Our review of the Fifth Circuit's transfer ruling is conducted within the analytical framework of *Christianson.* Although the Fifth Circuit did not explain its ruling, the Court held in *Christianson* that the fact that the appellate court "did not explicate its rationale is irrelevant, for the law of the case turns on whether a court previously 'decide[d] upon a rule of law' . . . not on whether, or how well, it explained the decision." 486 U.S. at 817, 108 S.Ct. at 2178. Therefore, unless the Federal Circuit can not find the transfer to the TECA to be plausible, and the succession of the Federal Circuit to this appeal to be correct, our jurisdictional inquiry is at an end. *See Xeta, Inc. v. Atex, Inc.,* 852 F.2d 1280, 1281 (Fed.Cir.1988).

Our review commences with the TECA's selection of "issue" jurisdiction in implementation of its statutory assignment, and whether the issue of the bankruptcy classification of the DOE's claim is plausibly within the exclusive jurisdiction of the TECA.

*A*

The Economic Stabilization Act of 1970 (ESA) was enacted in response to rising prices and spiraling inflation. Pub.L. No. 91–379, 84 Stat. 799 (1970), *codified at* 12 U.S.C. § 1904 note. The ESA authorized the President to stabilize prices, rents, wages, and salaries, and to establish priorities for use and allocation of petroleum products. Section 211 of the ESA, the judicial review provision, placed trial jurisdiction in the federal district courts and created the Temporary Emergency Court of Appeals, assigning to it exclusive appellate jurisdiction in cases and controversies arising under the ESA:

§ 211(b)(2) Except as otherwise provided in this section, the Temporary Emergency Court of Appeals shall have exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder. . . .

The purpose was "to funnel into one court all the appeals arising out of the District Courts and thus gain in consistency of decision".

S.Rep. No. 92–507, 92nd Cong., 1st Sess. 10, *reprinted in* 1971 U.S.C.C.A.N. 2283, 2292.

The ESA authority expired on April 30, 1974; however, ESA sections 205 through 213 (other than section 212(b)) were incorporated by reference into section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), which was enacted in response to nationwide shortages of petroleum products due to the 1973 Arab oil embargo. Pub.L. No. 93–159, 87 Stat. 627 (1973), *codified at* 15 U.S.C. §§ 751 *et seq.*

In January 1981 the President lifted all price controls of petroleum products. Exec. Order No. 12,287, 46 Fed.Reg. 9,909 (1981). The President's authority to promulgate regulations and controls under the EPAA expired on September 30, 1981 pursuant to a "sunset" provision, 15 U.S.C. § 760g, and has not been renewed. Section 760g provided that the expiration of this regulatory authority did not affect any pending action or proceeding not then finally determined, or any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to the expiration date.

The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), abolished the TECA and transferred its jurisdiction to the Court of Appeals for the Federal Circuit, amending the ESA to read:

§ 211(b)(2) Appeals from orders or judgments entered by a district court of the United States in cases and controversies arising under this title shall be brought in the United States Court of Appeals for the Federal Circuit if the appeal is from a final decision of the district court or is from an interlocutory appeal permitted under section 1292(c) of title 28, United States Code.

Pub.L. 102–572, § 102, 106 Stat. at 4506. Concurrently, 28 U.S.C. § 1295(a) was amended to add the following jurisdiction to that of the Federal Circuit:

(11) of an appeal under section 211 of the Economic Stabilization Act of 1970;

(12) of an appeal under section 5 of the Emergency Petroleum Allocation Act of 1973;

214

(13) of an appeal under section 506(c) of the Natural Gas Policy Act of 1978; and

(14) of an appeal under section 523 of the Energy Policy and Conservation Act.

## B

The TECA interpreted its statutory authorization as meaning "issue" jurisdiction, not "case" or "arising under" jurisdiction.[4] This interpretation has not been free of controversy, not only within the TECA but also in the regional circuit courts and among students of judicial structure.

In *United States v. Cooper*, 482 F.2d 1393, 1398 (Temp.Emer.Ct.App.1973) the TECA explained that a "loose" construction of its jurisdictional grant was not acceptable in light of the traditional rule that courts of special jurisdiction should strictly construe their statutory authorization. The court in *Cooper* therefore voided that portion of a Ninth Circuit transfer order that included a non-ESA issue. The TECA then dismissed the appeal of the counts that arose under the ESA as untimely filed in the TECA, adopting "issue" jurisdiction and incidentally illustrating one of the pitfalls that has accompanied "issue" jurisdiction, whereby procedural uncertainty has led to loss of substantive appeal rights.

The TECA has steadfastly implemented the jurisdictional policy and practice of deciding only the EPAA/ESA issues in a case, leaving to the regional circuit courts all other issues arising in the same transaction or joined to EPAA/ESA issues. *See, e.g., City of Groton v. Federal Power Comm'n*, 487 F.2d 927, 935–36 (Temp.Emer.Ct.App.1973) (the TECA refused to review Federal Power Act issues after having reviewed district court ruling that Federal Power Commission order did not violate the ESA); *Associated Gen. Contractors of Am., Inc. v. Laborers Int'l Union*, 489 F.2d 749, 750–51 (Temp.Emer.Ct.App.1973) (TECA refused to hear collective bargaining issue but heard appeal of ESA issue); *Spinetti v. Atlantic Richfield Co.*, 522 F.2d 1401, 1403 (Temp.Emer.Ct.App.1975) (antitrust, fair trade, and contract issues were separated and held appealable only to the Ninth Circuit); *Longview Refining Co. v. Shore*, 554 F.2d 1006, 1009 (Temp.Emer.Ct.App.) (TECA had jurisdiction over remaining EPAA/ESA issue after district court dismissed the antitrust and contract claims), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Texaco Inc. v. U.S. Dep't of Energy*, 616 F.2d 1193, 1196 (Temp.Emer.Ct.App.1979) (TECA lacks jurisdiction when sole question relates to DOE Organization Act, reaffirming TECA policy of "issue" jurisdiction); *Atlantic Richfield Co. v. U.S. Dep't of Energy*, 655 F.2d 227, 233 (Temp.Emer.Ct.App.1981) (TECA refused to hear contract issue but took appeal of issue of validity of DOE remedial order).

The TECA established two threshold requirements for its exercise of appellate jurisdiction: (1) resolution of the litigation must have required application or interpretation of

---

4. "Issue" jurisdiction refers to the assignment of jurisdiction limited to a particular issue, whether the issue is raised by complaint or only in the answer. "Case" jurisdiction refers to jurisdiction of all of the issues in the case whenever a particular issue is present, whether that issue is raised by complaint or only in the answer. "Arising under" jurisdiction refers to jurisdiction of all of the issues in a case whenever the jurisdiction-directing issue is raised by well-pleaded complaint. *See Pan American Petroleum Corp. v. Superior Court of Delaware*, 366 U.S. 656, 663, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961) (for a suit to "arise under" federal law "the face of the complaint" must show that resolution of the case depends upon a federal question); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950) (where the existence of a federal question is the basis of federal jurisdiction, such a question must be pre-sented by the plaintiff's claim itself); *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913) (whether a suit arises under federal law "cannot depend upon the answer, and accordingly jurisdiction cannot be conferred by the defence"); *Tennessee v. Union & Planters' Bank*, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894) (when the federal question is raised only in defense, the case does not "arise under" federal law). As we shall discuss, the TECA departed from the traditional view of "arising under" jurisdiction, despite the words of its enabling statute. *Compare Coastal States Marketing, Inc. v. New England Petroleum Corp.*, 604 F.2d 179 (2d Cir.1979) (discussing TECA's jurisdiction, see *post*) with *Christianson*, 486 U.S. at 809, 108 S.Ct. at 2174 ("a case raising a federal patent-law defense does not, for that reason alone, 'arise under' patent law").

the EPAA/ESA or its regulations, and (2) the EPAA/ESA issue must have been adjudicated in the district court. *See, e.g., Sector Refining, Inc. v. Enterprise Refining Co.,* 771 F.2d 496, 503 (Temp.Emer.Ct.App.1985) (jurisdiction depends not only on whether an EPAA issue existed but on whether one was adjudicated); *Citronelle–Mobile Gathering, Inc. v. Gulf Oil Corp.,* 591 F.2d 711, 716 (Temp.Emer.Ct.App.) (TECA has jurisdiction when resolution of litigation requires application and interpretation of the EPAA), *cert. denied,* 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979). When the TECA has taken jurisdiction on these criteria, the court has occasionally been required to consider and apply laws in interaction with the EPAA/ESA, in the course of deciding the issue before the court. An example is the bankruptcy cases, wherein the TECA has reviewed the classification, in accordance with the Bankruptcy Code, of claims made against a bankrupt estate under the EPAA/ESA. *E.g., U.S. Dep't of Energy v. West Texas Marketing Corp.,* 763 F.2d 1411 (Temp.Emer.Ct.App.1985). That is the issue of this case.

The TECA has exercised jurisdiction whenever an EPAA/ESA issue arose by claim, as a defense, or as a counterclaim. *See Citronelle–Mobile Gathering,* 591 F.2d at 716 (EPAA issues were raised in counterclaim, and the TECA would have heard them if appeal had not been withdrawn); *Sohio Petroleum Co. v. Caribou Four Corners, Inc.,* 573 F.2d 1259, 1262 (Temp.Emer.Ct.App. 1978) (defendant's answer raised issue of EPAA stripper well exemption; appeal of district court's findings on that issue was to the TECA). Other circuits acted similarly. *See Mountain Fuel Supply Co. v. Johnson,* 586 F.2d 1375, 1383 (10th Cir.1978) (EPAA issues raised in counterclaim were properly appealable to the TECA), *cert. denied,* 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979).

In sum, any issue requiring interpretation or application of the EPAA, ESA, and related regulations has been appealed exclusively to the TECA, separated from the other substantive issues in the case. *Mobil Oil Corp. v. Department of Energy,* 728 F.2d 1477, 1497 (Temp.Emer.Ct.App.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984).[5]

The authority of the TECA over subsidiary, procedural, and threshold issues has required frequent interpretation of § 211(b)(1) of the ESA, and has contributed conspicuously to the body of TECA jurisprudence. The continuing juridical diversion to jurisdictional questions, and the manifest burdens on parties and courts, led the TECA from time to time to reevaluate its approach. The court in 1985 referred to "the wasteful volleying of cases between the TECA and the courts of appeal", *Sector Refining,* 771 F.2d at 502, and observed that some "thirty percent of TECA's cases are decided upon jurisdictional grounds," *id.* (quoting from dissent in *Texaco,* 616 F.2d at 1199). However, the

---

5. The regional circuits have usually applied the TECA criteria in deciding whether to transfer appeals to the TECA. *See Atlantic Richfield Co. v. U.S. Dep't of Energy,* 769 F.2d 771, 778–79 (D.C.Cir.1984) (although the underlying controversy included issues involving the EPAA, the question on appeal involved interpretation of the DOE Organization Act and not the EPAA, and therefore the TECA's jurisdiction was not invoked); *United States v. Uni Oil, Inc.,* 646 F.2d 946, 949 (5th Cir.1981) (the TECA did not have jurisdiction of appeal by defendants charged with conspiracy and fraud for attempting to avoid EPAA price restrictions), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982). *See also United States v. Zang,* 645 F.2d 999, 1003 (Temp.Emer.Ct.App.1981) (civil and criminal penalty provisions of section 754 of the EPAA do not supersede or preempt Title 18 federal criminal offenses); *Coastal States Marketing, Inc. v. New England Petroleum Corp.,* 604 F.2d 179 (2d Cir.1979) (reviewing congressional intent). In *Coastal States Marketing* that court identified three possible views of the "cases and controversies arising under" language of ESA § 211(b)(2): (1) to assign to the TECA jurisdiction of the entire case when the well-pleaded complaint contains an ESA issue; this traditional "arising under" jurisdiction would provide consistent appellate law on the ESA issues that are raised in the complaint, but would scatter among the regional courts of appeal any ESA issues that are raised only by way of answer; (2) the "case" approach, wherein the TECA would decide all issues when ESA issues are raised in either complaint or answer; and (3) "issue" jurisdiction, which would assign to the TECA only the ESA issues, leaving all other issues in the case to the regional circuit courts of appeal. The court ultimately decided that Congress intended "issue" jurisdiction; this was the same interpretation that the TECA had adopted.

TECA did not modify its "generally utilitarian" approach, and writing in 1991 the court declined to "fritter away at this late date" two decades of decisions on jurisdiction. *Pennzoil Exploration and Prod. Co. v. Lujan,* 928 F.2d 1139, 1142 (Temp.Emer.Ct. App.1991).

It is the transfer of TECA jurisdiction to the Federal Circuit, and the manifest differences between TECA "issue" jurisdiction and Federal Circuit "arising under" jurisdiction, that occasions our consideration of the jurisdictional practice of the court to which we have succeeded.

## C

During the period of development of the Federal Circuit's structure, scholarly attention to the TECA's structure burgeoned. *See* Note, *The Appellate Jurisdiction of the Temporary Emergency Court of Appeals,* 64 Minn.L.Rev. 1247, 1272–73 (1980) (criticizing the TECA system requiring bifurcated appeals as resulting in "confusion, hardship for litigants, forced decision making, and delay"); Eric Watt Wiechmann & Charles J. Heinzer, *An Unappealing Dilemma: Searching for the Appellate Jurisdiction of the Temporary Emergency Court of Appeals,* 3 U. Bridgeport L.Rev. 305, 322 (1982) ("The existing status of the TECA's jurisdiction is unsatisfactory.") *See also* Howard H. Bruff, *Specialized Courts in Administrative Law,* 43 Admin.L.Rev. 329, 339 (1991) (the lesson learned from the TECA is to shunt litigation to the specialized court in its entirety). Commentators thus condemned the TECA's "issue" jurisdiction as entailing satellite litigation, causing transfers and retransfers of cases and parts of cases, and creating inefficiencies in the use of judicial and litigant resources. (We take note, however, that no congressional correction ensued.)

The Federal Circuit was organized with an explicitly broader appellate assignment than that of the TECA, apparently designed for the purpose of avoiding the problems inherent in "issue" jurisdiction. Thus, although the Federal Circuit's jurisdiction is assigned in "arising under" words, as was that of the TECA, there is a dispositive difference: 28 U.S.C. § 1295(a)(1) and (2) provide that the Federal Circuit shall have exclusive appellate jurisdiction "if the jurisdiction of [the district] court was based, in whole or in part, on [sections 1338 and 1346, respectively] of this title". The clause "in whole or in part" is absent from the TECA authorization.

In *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422 (Fed.Cir.1984) (*in banc*) this court interpreted § 1295(a)(1) as meaning that the Federal Circuit has exclusive jurisdiction of and indeed must decide non-patent issues that are appealed in cases that arise under the patent laws. We observed that Congress rejected "issue" jurisdiction for the Federal Circuit, Congress expressly drew a comparison with the TECA approach discussed in *Coastal States Marketing:*

> Paragraph (1) of new section 1295(a) gives the Court of Appeals for the Federal Circuit jurisdiction of any appeal in which the trial court jurisdiction was based, in whole or in part, on section 1338 of title 28.... Cases will be within the jurisdiction of the Court of Appeals for the Federal Circuit in the same sense that cases are said to "arise under" federal law for purposes of federal question jurisdiction. *Contrast, Coastal States Marketing, Inc. v. New England Petroleum Corp.,* 604 F.2d 179 (2d Cir.1979).

H.R.Rep. No. 312, 97th Cong., 1st Sess. 41 (1981). *Atari v. JS & A,* 747 F.2d at 1435.

## D

On this background, we consider the plausibility of the transfer of a case involving the bankruptcy classification of the DOE's claim under ESA section 209 to the TECA.

In its motion before the Fifth Circuit, the government argued that it is necessary to apply or interpret the EPAA/ESA in deciding the issue of the bankruptcy classification of the DOE's claim; that the TECA has consistently held that it has exclusive jurisdiction of this issue; and that the Fifth Circuit has previously transferred appeals of such issues to the TECA.

TECA precedent and that of the regional circuit courts are not in complete accord on whether the bankruptcy classification of a claim under section 209 of the ESA is an

ESA issue for the purpose of appellate jurisdiction. The TECA held that this issue is within its exclusive jurisdiction in *West Texas Marketing,* 763 F.2d at 1426, and declined to revisit the question in *In re Transcontinental Energy Corp.,* 950 F.2d 733 (Temp.Emer.Ct.App.1991). Other courts have agreed with the TECA's view of its jurisdiction. *E.g., Transcontinental Energy,* 950 F.2d at 735 n. 3 (appeal of classification issue transferred from the Ninth Circuit); *In re Compton,* 889 F.2d 1104, 1105 (Temp.Emer.Ct.App.1989) (appeal of classification issue transferred from the Fifth Circuit). We are aware of only one reported exception, wherein the Tenth Circuit held that the issue is simply a matter of bankruptcy law, *In re Seneca Oil Co.,* 906 F.2d 1445, 1454–55 (10th Cir.1990), and declined to transfer the appeal to the TECA.

In view of the TECA's consistent rulings on its "issue" jurisdiction, including issues in bankruptcy proceedings, and our observation that decision of the classification question indeed requires interpretation of the ESA and successor statutes, we conclude that the transfer of this appeal to the TECA (and by succession to the Federal Circuit) is in accord with TECA precedent, and thus is plausible in terms of *Christianson.* The request of Texas American to transfer the appeal back to the Fifth Circuit must be denied.

## II

## THE BANKRUPTCY APPEAL

On July 2, 1987 Texas American commenced bankruptcy proceedings under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.* The DOE filed a claim as creditor, based on the DOE's ruling that a subsidiary of Texas American had received small refiner bias entitlements in violation of section 209 of the ESA, as incorporated into section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1). The trustee in bankruptcy classified the claim as a non-pecuniary loss in accordance with 11 U.S.C. § 726(a)(4). The claim was otherwise allowed.

The relevant classifications of the Texas American Bankruptcy Committee Plan of Liquidation are as follows:

§ 3.07 Class 7 (Unsecured) Claims—Allowed Claims of unsecured creditors, including without limitation, all Claims asserted by or on behalf of the Debentureholders.

§ 3.09 Class 9 (Non–Pecuniary Loss) Claims—Allowed Claims of holders of Allowed Claims for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, as further described in 11 U.S.C. § 726(a)(4).

Section 726(a)(4) of the Bankruptcy Code subordinates non-pecuniary loss claims to the fourth priority:

**11 U.S.C. § 726. Distribution of property of the estate**

\*　　\*　　\*　　\*　　\*　　\*

(a)(4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty or forfeiture ... to the extent that such fine, penalty, or forfeiture or damages are not compensation for actual pecuniary loss suffered by the holder of such claim.

Class 7 claims are superior to Class 9; there are insufficient assets to satisfy any Class 9 claim, or to satisfy fully the Class 7 claims.

The DOE argued that since its claim for recovery under ESA section 209 was for "restitution" it should be classified with the unsecured claims of Class 7. The bankruptcy court, however, agreed with the trustee that Class 9 was more appropriate. The court explained that the recent Supreme Court decisions in *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) and *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) clarified that the designation of a particular recovery as "restitution" or as a "penalty" was not a matter of linguistics, but depends on the particular facts.

The bankruptcy court held that since the claim is not compensation for actual pecuniary loss suffered by the holder of the claim— as the government apparently agrees as to all or most of the claim—then it is not a Class 7 claim. Observing that there would be no recovery by or payment to the persons that suffered the loss, the bankruptcy court

concluded "that this claim must be treated as a fine, penalty or forfeiture [for it] is not compensation for actual pecuniary loss suffered by the holder of the claim". Record at 27, *In re Texas American.*

The DOE appealed to the district court, who reversed the bankruptcy court, citing *West Texas Marketing.* The district court held that the TECA's decision in *West Texas Marketing* must be followed until overruled by the TECA or the Supreme Court. In *Transcontinental Energy* the TECA followed its decision in *West Texas Marketing,* declining to review the premises. Although the bankruptcy court had remarked that in *Transcontinental Energy* the TECA had not addressed the intervening Supreme Court holdings in *Kelly* and *Davenport,* the district court pointed out that the TECA decisions had not been overruled. Thus the district court held that in accordance with *West Texas Marketing* the DOE's claim under section 209 should be classified with Class 7.

■ The classification of a claim in bankruptcy is a question of law, and is reviewed for correctness. *See In re Lumber Exch. Bldg. Ltd. Partnership,* 968 F.2d 647, 649 (8th Cir.1992) ("We review *de novo* the propriety of classification"); *In re EGBE,* 107 B.R. 711, 712 (9th Cir. BAP 1989) (whether appellant is entitled to secured creditor status is a question of law, entitled to *de novo* review).

### A

The liability for and amount of the claim are not now disputed, and the only issue is the classification priority.

Texas American argues that there have been significant changes in law and policy since *West Texas Marketing* was decided in 1985, and urges that the applicability of that decision to this claim be reviewed in light of these changes. Texas American refers to the enactment in 1986 of the Petroleum Overcharge Distribution and Restitution Act, accompanied by the DOE's official changes in policy and implementation with respect to disposition of recovered overcharges. Texas American states that these changes have controlling consequences for the issue at bar,

stating that at least eighty percent of the DOE's claim can not be even colorably viewed as "restitution". Texas American also states that the Supreme Court's analyses of penalty and restitution in bankruptcy in *Kelly* and in *Davenport* require that the court ascertain and apply an accurate view of the claimed recovery.

We agree that these statutory, judicial, and policy changes, all occurring after the TECA's decision in *West Texas Marketing,* warrant our revisiting the issue.

### B

In accordance with the ESA, upon enforcement action brought by the DOE the courts may order restitution of the overpayment that a seller of petroleum products obtained in violation of regulated prices. ESA section 209 provides:

> ... In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation.

Congress had stressed in enacting the ESA that the explicit reference to restitution in section 209 was to settle any doubt that "there was an inherent equitable power in the court to set things right and order restitution." S.Rep. No. 92–507, 92nd Cong., 1st Sess. 9, *reprinted in* 1971 U.S.C.C.A.N. at 2291.

The DOE established procedures for the identification of claimants who experienced illegal overcharges, and undertook to administer the mandated restitution. Although restitution was achieved in some cases, as the program continued large sums of money accumulated, due to the pragmatic impossibility of identifying and making payment to those who incurred pecuniary losses due to violations of the ESA.

The courts were aware of the mounting problems of achieving the mandated restitution. In *United States v. Exxon Corp.,* 773 F.2d 1240, 1284–86 (Temp.Emer.Ct.App. 1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986) the TECA discussed the statutory purpose of providing restitution to the persons who had actually suffered the losses. The TECA concluded

that in view of the diffusion of overcharges through the distribution system, payment of the sums recovered from Exxon to the first purchasers of the petroleum products, who had simply passed the overcharges on to their customers, "would result in inequities, inconsistent with the fundamental purpose of restitution under Section 209", and "would simply result in a windfall gain for that purchaser." *Exxon,* 773 F.2d at 1286. The TECA ordered that the overcharges recovered from Exxon be channeled through the states for the purpose of funding specific energy programs designed to benefit the public. *Id.* at 1280–83.

This judicial action was consistent with the "Warner Amendment", Pub.L. No. 97–377, § 155, 96 Stat. 1830 (1982), which gave the DOE authority to disburse unclaimed funds:

§ 155(a) It is the purpose of this section to provide the Secretary of Energy the exclusive authority for the disbursement of the designated petroleum violation escrow funds for limited restitutional purposes (1) which are reasonably expected to benefit the class of persons injured by such violations, and (2) which, based on information previously provided to the Congress by the Secretary of Energy are likely not to be, through procedures established by regulation, otherwise refunded to injured persons because the purchasers of the refined petroleum products cannot reasonably be identified or paid or because the amount of each purchaser's overcharge is too small to be capable of reasonable determination.

96 Stat. at 1919. By this statute the Secretary of Energy was required to distribute the escrow funds to the governors of each of the states, in an amount based on the state's proportionate share of nationwide consumption of refined petroleum products from 1973 to 1981. *Id.* § 155(b),(d). Each state was required to use the funds under one or more

of five existing federal energy conservation programs identified in the Warner Amendment, for purposes of weatherization of buildings, implementation of state energy conservation programs, reduction of energy consumption in schools and hospitals, promotion of conservation by businesses and individuals, and assisting the poor with home utility bills.[6]

In *In re Dep't of Energy Stripper Well Exemption Litigation,* 653 F.Supp. 108 (D.Kan.1986), *aff'd,* 855 F.2d 865 (Temp.Emer.Ct.App.1988), the district court recognized the inability of the government to identify specific overcharge victims, and approved a settlement that provided for disbursal of the recovered overpayment that could not be restored to those actually injured. Settlement Agreement, *reprinted in* 17 DOE ¶ 90,509 (1988). The settlement required that a sufficient amount of money be retained by the DOE in escrow to satisfy any claims for individual losses, and that the balance of the funds be distributed half to the states for use in energy-related programs, and half to the United States Treasury or such other use as the Secretary of Energy directed.

Neither the *Exxon* nor the *Stripper Well* case was concerned with bankruptcy issues or consequences. However, these dispositions of recoveries under ESA section 209 illustrate the recognition by the courts and by Congress that it may not be possible to restore the recovered overcharges to the persons who suffered the losses, as the ESA had contemplated and required.

Reflecting the increasing accumulation of escrow funds, the Warner Amendment was superseded by the Petroleum Overcharge Distribution and Restitution Act of 1986 (PODRA), Pub.L. No. 99–509, Title III, § 3002, 100 Stat. 1881 (1986), *codified at* 15 U.S.C.

---

**6.** The programs set forth in § 155(e)(2) of the Warner Amendment included:

(A) the program under part A of the Energy Conservation and Existing Buildings Act of 1976 (42 U.S.C. §§ 6861 *et seq.*);

(B) the programs under part D of the Energy Policy and Conservation Act (relating to primary and supplemental state energy conservation programs; 42 U.S.C. §§ 6321 *et seq.*);

(C) the program under part G of title III of the Energy Policy and Conservation Act (relating to state energy conservation for schools and hospitals; 42 U.S.C. §§ 6371 *et seq.*);

(D) the program under the National Energy Extension Service Act (42 U.S.C. §§ 7001 *et seq.*); and

(E) the program under the Low–Income Home Energy Assistance Act of 1981 (42 U.S.C. §§ 8621 *et seq.*).

§§ 4501–4507. In enacting the PODRA, Congress referred to the billions of dollars that had accumulated and for which restitution to the persons injured was not possible. The PODRA requires the DOE to reserve sufficient funds to make restitution to those who suffered the actual losses, 15 U.S.C. § 4502(c)(1), and to pay the excess to federal and state treasuries "as indirect restitution":

> **15 U.S.C. § 4502(d) Disbursement of excess amount as indirect restitution for energy conservation programs**
>
> (1) ... [T]he Secretary shall promptly provide for the disbursement of a portion or all of such excess amount for use in energy conservation programs. The amount so disbursed for a fiscal year shall be the smaller of—
>
> (A) $200,000,000 minus the amount of Federal funds appropriated for energy conservation programs for such fiscal year; or
>
> (B) the amount determined under subsection (c) of this section to be the excess amount for such fiscal year.
>
> \*   \*   \*   \*   \*   \*

**§ 4503 Deposit of remainder of excess amount into the Treasury as indirect restitution**

> The amount that remains from the excess amount described in section 4502(c) of this title after all disbursements have been made for the fiscal year under section 4502(d) of this title shall be deposited by the Secretary of the Treasury into the general fund of the Treasury.

The disbursement plan set in the PODRA was a departure from the restitutionary plan of the ESA, in that Congress now authorized the deposit of recovered overcharge funds directly into the general fund of the United States. The Committee Report estimated that the PODRA would result in deposit to the Federal Treasury of $1.7 billion for fiscal years 1987 through 1989. H.R.Rep. No. 727, 99th Cong., 2nd Sess. 41, *reprinted in* 1986 U.S.C.C.A.N. 3607, 3637.

In implementation, the DOE in 1986 issued a "Statement of Modified Restitutionary Policy in Crude Oil Cases":

> Up to 20 percent of the funds will be reserved for payment of claims of eligible parties, and the balance will be divided [by distributing one half to] the states, territories and possessions of the United States, and the [remaining half to the] U.S. Treasury, as indirect restitution to unidentified injured parties.

51 Fed.Reg. 27,899 (1986).

■ The DOE argues on this appeal that the payment to the federal and state treasuries and the partial usage for energy-related purposes is the equivalent of restitution, and thus requires the bankruptcy treatment of these funds as restitution. The DOE argues that since the entire nation was damaged by petroleum price overcharges, and the economy generally will benefit from reduction in the national debt, this payment to federal and state governments may be viewed as restitution to the nation.

Texas American argues that the Bankruptcy Code requires that claims of specific out-of-pocket creditors take priority over claims for sums to be paid to the government based on wrongdoing of the debtor. Texas American points out that the government is not claiming an actual pecuniary loss, as the subordination statute requires, in contrast to the debentureholders of Class 7 of the Plan of Liquidation. Texas American states that since at least eighty percent of the DOE's section 209 claim is on behalf of the federal and state governments to whom the recovery will be paid, it is incorrect to classify this amount of the claim with the claims of creditors who have suffered an out-of-pocket, pecuniary loss.

We think that Texas American's argument is in better accord with the principles of restitution as embodied in the ESA and as applied in the bankruptcy context.

### C

■ Restitution is an equitable remedy whereby the wrongdoer is required to restore the injured person to the situation that prevailed before the wrong was committed. *Restatement of Restitution,* §§ 150–159, Introductory Note (1937). There must be some relationship between the person in-

jured and the recipient of the recovery. *See Hughey v. United States*, 495 U.S. 411, 416, 110 S.Ct. 1979, 1982, 109 L.Ed.2d 408 (1990) ("the ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event").

It is undisputed that no significant restitution has been made or is expected to be made to any person who actually suffered a pecuniary loss due to the small refiner bias overpayments to the Texas American subsidiary company. It is undisputed that at least eighty percent of the recovery will be paid to federal and state governments. The government has the sole interest in this recovery. This is relevant to section 726(a)(4) of the Bankruptcy Code, which defines the fourth priority as including recovery of a fine, penalty, or forfeiture, to the extent that such recovery is "not compensation for actual pecuniary loss suffered by the holder of such claim".

The DOE points out that in *West Texas Marketing* the TECA held that the "restitutionary character" of the DOE's recovery under ESA section 209 is unrelated to whether the recovered funds will be distributed to the actual parties who were overcharged. 763 F.2d at 1426. While we agree that "restitution" and the disgorgement of "unjust enrichment" are related concepts, we take note that *West Texas Marketing* was decided before the courts, Congress, and the DOE resolved the growing problems flowing from the inability to "restore" the losses of the persons who were overcharged. When restitution to those who suffered the losses was not feasible, the acknowledged public purpose was to remedy unjust enrichment of the wrongdoer.

Congress, the DOE, and the courts all acted for this purpose. The PODRA-authorized disposition of recovered overcharges to governmental treasuries does not require that the federal and state governments suffered a pecuniary loss. Compare the recovery in *United States v. P/B STCO 213*, 756 F.2d 364 (5th Cir.1985), wherein the government expended funds to clean waters polluted by the defendant, and sought to recover the actual cost of the cleanup. In contrast, the governments in this case expended no funds, and suffered no actual loss.

The Bankruptcy Code serves a different public purpose. In effecting the principles of creditors' and debtors' rights and obligations, one of the firmest of principles is that creditors who suffered a pecuniary loss to the bankrupt have priority of claim over those who suffered no pecuniary loss. *See* 11 U.S.C. § 726(a); 4 Collier on Bankruptcy ¶ 726.02[4] (15th ed. 1986). The DOE argues that the wording of § 726(a)(4) makes pecuniary loss relevant only after it is determined that a penalty is involved, referring to *West Texas Marketing*, 763 F.2d at 1426. However, when the PODRA authorized payment to public treasuries of the unrestored portion of recovered overcharges, the character of that portion of the recovery, for the purpose of bankruptcy relationships, was changed in a significant way.

■ "Restitution" requires not only disgorgement of illegal profits, but also return to the persons who suffered the loss. *See Kelly v. Robinson*, 479 U.S. at 51–52, 107 S.Ct. at 362 ("[R]estitution is forwarded to the victim, and may be calculated by reference to the amount of harm the offender has caused.") When those injured are not restored to their previous position, the disgorgement partakes not of restitution, but of recovery by government of the illegal gains for remedial and enforcement purposes. In discussing the subordination statute, the bankruptcy court in *In re Schultz Broadway Inn, Ltd.*, 89 B.R. 43, 44 (Bankr.W.D.Mo. 1988), *aff'd*, 912 F.2d 230 (8th Cir.1990), stated that "students of bankruptcy law know that all penalties are divided into two categories, i.e., 'pecuniary loss penalties' and 'non pecuniary loss penalties.' ... [I]f such fines or penalties are punitive in nature and not for actual pecuniary loss, they are not given priority but rather are subordinated in order of payment under section 726(a)(4)." *See also* 3 Collier on Bankruptcy ¶ 507.04[7][h].

These differences have been readily recognized in other contexts. *See, e.g., In re Unified Control Sys., Inc.*, 586 F.2d 1036, 1037–38 (5th Cir.1978) ("[T]he label placed upon an imposition in a revenue measure is [not] decisive in determining its charac-

ter....the character of a penalty cannot be changed by calling it a tax.") (citation omitted). In *Bowles v. Farmers Nat'l Bank,* 147 F.2d 425 (6th Cir.1945), involving recovery of over-charges under the Emergency Price Control Act of 1942, the court stated that "if a sum of money is recovered by a third person for violation of a statute instead of the person injured ... it constitutes a penalty rather than damages". *Id.* at 428 (holding that the recovery was a penalty, for tax purposes, because it was paid not to those injured, but to the government). In *Porter v. Montgomery,* 163 F.2d 211 (3d Cir.1947) the court commented that a "civil action is for damages if it is brought for the compensation of the injured individual. It is for a penalty if it seeks to obtain a sum of money for the state, an entity which has not suffered direct injury by reason of any prohibited action." *Id.* at 214.

In enacting the ESA, Congress intended and required that the recovery be distributed to the persons who were directly injured by the illegal overcharges. When such distribution was recognized as impossible, Congress changed the statute. Although the usage "indirect restitution" in the PODRA provides a certain historical continuity, the words must yield to substance. Applying the PODRA in light of the considerations relevant to the bankruptcy classification requires a realistic assessment of the nature of the claim to the recovery that will be paid to the governmental treasuries. Such an assessment is illustrated in the Supreme Court decisions in *Kelly* and *Davenport.* Although these decisions are not as pointed as Texas American urges, they further illustrate the principle that remedies styled as "restitution" must be viewed for bankruptcy purposes in light of the particular facts. In *Kelly v. Robinson,* 479 U.S. at 52–53, 107 S.Ct. at 362–63, the Court held that payment of "restitution" of welfare benefits in connection with a criminal sentence is treated like a criminal penalty and is exempt from discharge in bankruptcy. In *Pennsylvania v. Davenport,* 495 U.S. at 561–62, 110 S.Ct. at 2132, the Court held that subordination to 11 U.S.C. § 726(a)(4) includes civil as well as criminal fines and penalties, as a corollary to

the discharge provision of 11 U.S.C. § 523(a)(7).

*Kelly* and *Davenport* thus applied in specific bankruptcy contexts the general principle that the nature of a remedy depends on "whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual". *Huntington v. Attrill,* 146 U.S. 657, 668, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892). The TECA remarked in *Citronelle-Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722 (Temp.Emer.Ct.App.1982) that the DOE is charged with enforcing "public, not private rights". *See also In re Dep't of Energy Stripper Well Exemption Litigation,* 968 F.2d 27, 37 n. 10 (Temp.Emer.Ct.App. 1992) (the disbursement to the state and federal treasuries is "reimbursement to the true victims of the overcharges, the public"); *Lea Exploration, Inc. v. Department of Energy,* 843 F.2d 510, 515 (Temp.Emer.Ct.App. 1988) (ESA section 209 action is characterized as a claim to enforce public rights).

These principles are not platitudes, and when applied in the bankruptcy context they have substantive effect. Thus we conclude that the government's section 209 claim in this case against Texas American is properly separated into claims for pecuniary and non-pecuniary losses. *See In re Hirsch-Franklin Enters., Inc.,* 63 B.R. 864, 872 (Bankr. M.D.Ga.1986) (government claim for a pecuniary loss penalty held entitled to priority, and claims for non-pecuniary loss penalty subordinated in accordance with § 726(a)(4)); 4 Collier on Bankruptcy ¶ 726.02[4] (in a treble damage antitrust claim, the single damage claim is classified under § 726(a)(2) while the remainder is classified under § 726(a)(4)). In accordance with the PODRA and the DOE implementation, as discussed *ante,* a portion of the recovery is for the benefit of claimants who suffered an actual pecuniary loss due to the overcharges. This portion of the claim was properly classified in Class 7 of the Plan of Liquidation. The claim for the portion of the recovery to be paid to governmental treasuries is properly subordinated to Class 9, for the government suffered no pecuniary loss. The judgment is modified accordingly.

*Costs*

No costs.

*MODIFIED.*